## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **NAFISA BABAMURADOVA, et al.,** | |
| **Plaintiffs** | |
| **v.** | **Civil Action No. 22-1460 (JDB)** |
| **ANTONY J. BLINKEN, et al.,** | |
| **Defendants.** | |
| | |
| **ZULFIYA KHAMIDOVA, et al.,** | |
| **Plaintiffs** | |
| **v.** | **Civil Action No. 22-1990 (JDB)** |
| **ANTONY J. BLINKEN, et al.,** | |
| **Defendants.** | |
| | |
| **LEONID FATIKOV, et al.,** | |
| **Plaintiffs** | |
| **v.** | **Civil Action No. 22-2428 (JDB)** |
| **ANTONY J. BLINKEN, et al.,** | |
| **Defendants.** | |

## <u>MEMORANDUM OPINION</u>

Plaintiffs Nafisa Babamuradova, Zulfiya Khamidova, and Leonid Fatikov, along with their derivative family members, were selected to apply for a diversity visa in fiscal year ("FY") 2022. Although they were selected to submit an application and did so in a timely manner, plaintiffs have not received an interview from the State Department, which is required to be considered for a diversity visa. In September 2022, each plaintiff filed a motion for temporary restraining order

1

("TRO") seeking to compel the State Department to schedule a visa interview before the September 30, 2022 end of fiscal year.  For the reasons set forth below, the Court will deny plaintiffs' motions.

## Background

### I.   Diversity Visa Program

Each fiscal year, the State Department allows citizens of certain underrepresented countries to submit an entry to the Diversity Visa program.  Diversity visas are made available under the Immigration and Nationality Act ("INA") to promote immigration from countries that historically have had lower rates of immigration to the United States.  See 8 U.S.C. § 1153(c)(1).  Congress has capped the annual number of diversity visas at 55,000.  Id. § 1151(a)(3), (e).  A number of those are reserved for use under a separate program (established by the Nicaraguan and Central American Relief Act), so the State Department estimates that only 54,850 diversity visas will actually be available this year.  See Aug. 2021 Visa Bulletin [Babamuradova ECF No. 13-5] at 9.

The number of entries or applicants vastly exceeds the number of spots available.  Of the millions of entries, the Kentucky Consular Center ("KCC") selects fewer than 150,000 applications each fiscal year and offers those people an opportunity to apply for a diversity visa.  See Aug. 2021 Visa Bulletin at 9 (noting that in FY 2022 "[a]pproximately 119,021 applicants" out of over seven million entries were selected).  KCC holds selected applicants' cases "until those selected are entitled to make a formal application for a visa at a U.S. consular office abroad."  9 Foreign Affs. Manual ("FAM") § 502.6-4(c)(1)(b).  An applicant's selection by KCC does not guarantee that they will receive a visa, only that they will be given an opportunity to apply for one.  See P.K. v. Tillerson, 302 F. Supp. 3d 1, 3 (D.D.C. 2017).

KCC selects applicants using a random number system which generates "rank order number[s]" broken down into six geographic regions.  See 9 FAM § 502.6-4(c)(2)(a)–(b).  "Within

2

each region, the first entry randomly selected will have a rank order number 00000001, the second entry selected will be 00000002, etc." Id. § 502.6-4(c)(2)(b).

Applicants who are selected by KCC "will be instructed to complete Form DS-260, Online Application for Immigrant Visa and Alien Registration." 9 FAM § 502.6-4(d)(1)(a). Once applicants have submitted a DS-260, then "[o]rdinarily . . . the case will be 'documentarily qualified' for purposes of visa appointment scheduling." Id. § 502.6-4(d)(1)(b). Prior to December 2021, applicants needed to have submitted the DS-260 and supporting documentation. See id. § 502.6-4(d)(1)(b). However, updated guidance issued in December 2021 now provides that "DV-2022 selectees no longer must submit to the KCC any other required supporting documents for DV-2022 in order to be eligible to be scheduled for an in-person interview at an embassy or consulate." Diversity Visa 2022 Update [Babamuradova ECF No. 13-2] ("Dec. 9, 2021 Guidance") at 1. Instead, applicants now must bring supporting documentation to their interviews. Id. Under either documentation policy, the fact than an applicant is "documentarily qualified" does not alone make him or her eligible to schedule an interview: the applicant's regional lottery rank number must also be "within the applicable rank cut-off for that month." 9 FAM § 502.6-4(c)(2)(c).

Under a prior version of the FAM guidelines, KCC would "schedule an appointment for a 'documentarily qualified' applicant when their regional lottery rank number is about to become current." Archived Version of 9 FAM § 502.6 [Babamuradova ECF No. 13-3] ("Former FAM Guidelines") at 12. The current version of the guidelines, implemented in mid-February 2022, states that KCC will "schedule an appointment for applicants that have completed processing at KCC around the time their regional program rank number is current." 9 FAM § 502.6-4(d)(2).

As the government describes it in a series of declarations, when an applicant's documents have been submitted and KCC has completed processing them, the case is "reported to the Visa

Office," which "allocates a visa number," which then makes the case eligible to be scheduled. Decl. of Brenda Grewe [Babamuradova ECF No. 16-4] ("Babamuradova Grewe Decl. III") ¶ 2. At this point, the Office deems them at the "AV" stage and puts them in the "AV queue."  Id. "When a post provides or updates its capacity and schedule for DV interview to KCC, KCC inputs the capacity and schedule by post into [the Diversity Visa Information System ("DVIS")], which then fills those appointments with cases with consideration of the full case number (i.e., regional rank order) and the date those cases moved into AV status."  Id.  Hence, the schedule for interviews is not solely dependent on the regional rank order assigned to an applicant.  Within each region, there are a number of posts, each with their own schedule and capacity.  An applicant with a lower regional rank number could nonetheless be scheduled for an interview after a higher-numbered applicant if, say, the processing of their documents was completed later (either due to the applicant's delay or issues with the documents submitted) or if the post to which they are assigned has more applicants or schedules interviews more slowly than a different post (even one within the same region).  See Decl. of Morgan Miles [Khamidova ECF No. 11-2] ("Khamidova Miles Decl.") ¶¶ 9–10 (describing the scheduling process).

There are many reasons why an applicant who was initially selected to apply for a diversity visa may ultimately not receive one.  Selectees are eligible to receive a visa only during the fiscal year in which they were selected to apply—"consular officers may not issue diversity visas after midnight on September 30" of the relevant fiscal year.  Almaqrami v. Pompeo, 933 F.3d 774, 777 (D.C. Cir. 2019).  Further, as described above, the number of diversity visas is statutorily capped at 55,000, but far more applicants are selected to apply than there are spots.  The State Department could run out of time or spots, or it could determine that an individual applicant does not qualify under immigration laws.  Cf. 9 FAM § 502.6-4(d)(1)(b) ("KCC will . . . flag for consular officers any apparent inconsistencies or potential fraud indicators.").  Regardless of the reason, when

September 30 comes around, any selectees who have not yet received a visa are out of luck.  See Shahi v. U.S. Dep't of State, 33 F.4th 927, 928 (7th Cir. 2022) ("This fiscal-year limit has caused many an application to fail, because it means that bureaucratic inertia or foul-ups have the same effect as affirmative decisions that applicants are ineligible.").

If, however, an applicant is interviewed and otherwise meets the criteria to obtain a diversity visa, then the State Department "shall" issue the visa to the applicant.  See Almaqrami, 933 F.3d at 777 (quoting 8 U.S.C. § 1153(c)).

Consulate offices (referred to as "posts") are responsible for processing a wide range of immigrant and nonimmigrant visas.  During the COVID-19 pandemic, the State Department issued mandatory guidance to consulates regarding the prioritization of consular services during the pandemic.  This guidance was replaced in November 2021 with a new policy, reflected in the cable 21 STATE 115378, which "rescinds mandatory prioritization guidance."  Recalibration Cable [Babamuradova ECF No. 13-6] at 1.  Under the November 2021 policy, "[c]onsular chiefs should determine the priority order of consular services processed at post."  Id.  For much of FY 2022, then, consulates had greater flexibility in prioritizing visa applications than they previously had during much of the pandemic.

## II.   Plaintiffs' Applications

There are three sets of plaintiffs in these coordinated cases.  Each plaintiff was selected in the FY 2022 diversity visa lottery and therefore given an opportunity to apply for a visa.  Each has submitted the required forms to KCC (either a DS-260 after December 21, 2021, or a DS-260 and required supporting documentation before December 9, 2021, see Khamidova Miles Decl. ¶ 9), and KCC has completed processing for each of their cases, see id. ¶ 17; Decl. of Morgan Miles [Babamuradova ECF No. 16-1] ("Babamuradova Miles Decl.") ¶¶ 8, 14.

Plaintiff Babamuradova and her derivatives' designated processing post is the U.S. Embassy in Tashkent.  Babamuradova Miles Decl. ¶ 7.  As of September 5, KCC had scheduled interviews for 935 FY 2022 diversity visa cases at the U.S. Embassy in Tashkent.  Id. ¶ 9.  At that time, there were also 618 cases assigned to the U.S. Embassy in Tashkent that were ready to have their interviews scheduled, and 572 of those cases were ahead of Babamuradova in line.  Id.

Plaintiff Fatikov and his derivatives' designated processing post is the U.S. Embassy in Warsaw.  Babamuradova Miles Decl. ¶ 13.  That embassy had scheduled 1,514 interviews as of September 5, and there are 968 more cases assigned to it that are ready to be scheduled.  Id. ¶¶ 15–16.  Fatikov is number 475 in line.  Id. ¶ 16.

Finally, plaintiff Khamidova's designated processing post is the U.S. Consulate in Almaty.  Khamidova Miles Decl. ¶ 16.  That consulate has scheduled interviews for 545 cases.  Id. ¶ 18.  There are 607 other cases assigned to the U.S. Consulate in Almaty ready to have interviews scheduled, and 263 of those cases are before Khamidova's in the scheduling order.  Id. ¶ 19.

### III.    Procedural History

Plaintiffs filed nearly identical motions for a temporary restraining order in each of these three cases in mid-September.  See Pls.' Mem. in Supp. of Mot. for TRO [Babamuradova[1] ECF No. 13-1] ("Mot. for TRO") at 30; Pls.' Mem. in Supp. of Mot. for TRO [Fatikov ECF No. 5-1] at 31; Pls.' Mem. in Supp. of Mot. for TRO [Khamidova ECF No. 13-1] at 30.  The Court ordered consolidated briefing and scheduled a consolidated hearing for September 22, 2022.  In advance of the September 22 hearing, the government filed a notice of supplemental authority, describing oral rulings by two courts in this district the day prior, which denied similar motions for a temporary restraining order filed by plaintiffs' counsel.  See Notice of Suppl. Authority

---

[1] Citations to an ECF number proceeded by Babamuradova refer to the docket in Case. No. 22-cv-1460; those citations preceded by Fatikov refer to Case No. 22-cv-2428; and those citations preceded by Khamidova refer to Case No. 22-cv-1990.

[Babamuradova ECF No. 20] at 1–2 (describing the hearing in Obiedat v. Blinken, Civ. A. No. 22-2326 (APM) (D.D.C.) and the consolidated hearing in Ghozieva v. Blinken, Civ. A. No. 22-2215 (BAH) (D.D.C.) and Elbasioglu v. Blinken, Civ. A. No. 22-1902 (BAH) (D.D.C.)).

## Legal Standard

A temporary restraining order is "an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." Postal Police Officers Ass'n v. U.S. Postal Serv., 502 F. Supp. 3d 411, 418 (D.D.C. 2020) (quoting Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004)). A plaintiff seeking a temporary restraining order must make the same showing as he would if seeking a preliminary injunction: he must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Gordon v. Holder, 632 F.3d 722, 724 (D.C. Cir. 2011) (quoting Winter v. Nat. Res. Def. Council, 555 U.S. 7, 20 (2008)). Of these factors, the first two are the most important, Gorgadze v. Blinken, Civ. A. No. 21-2421 (JDB), 2021 WL 4462659, at *5 (D.D.C. Sept. 29, 2021) (citation omitted), and critically, "[w]ithout a likelihood of success on the merits, [p]laintiffs are not entitled to a preliminary injunction regardless of their showing on the other factors," id. (second alteration in original) (citation omitted). Part of the inquiry into whether plaintiffs have demonstrated a likelihood of success on the merits is necessarily whether they are likely to have standing, and as a result, a "party who fails to show a 'substantial likelihood' of standing is not entitled" to emergency relief. Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 913 (D.C. Cir. 2015) (citation omitted).

## Analysis

**I.    Plaintiffs Lack Standing to Challenge the Policy Changes**

"To establish standing, the plaintiff must show (1) it has suffered a concrete and particularized injury (2) that is fairly traceable to the challenged action of the defendant and (3) that is likely to be redressed by a favorable decision . . . ." Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity, 878 F.3d 371, 376–77 (D.C. Cir. 2017) (cleaned up) (citation omitted); see also Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992) (describing the three requirements for standing). "When plaintiffs sue based on a 'procedural injury'—or the agency's failure to act according to an applicable statutory or regulatory framework—that claim 'must be tethered to some concrete interest adversely affected by the procedural deprivation: A procedural right in vacuo . . . is insufficient to create Article III standing.'" Gjoci v. Dep't of State, No. 1:21-CV-00294-RCL, 2021 WL 3912143, at *8 (D.D.C. Sept. 1, 2021) (cleaned up) (quoting WildEarth Guardians v. Jewell, 738 F.3d 298, 305 (D.C. Cir. 2013)). A plaintiff may argue that the challenged actions have merely increased the risk of harm to the plaintiff, but if so, the plaintiff must show "both (i) a substantially increased risk of harm and (ii) a substantial probability of harm with that increase taken into account." Food & Water Watch, Inc., 808 F.3d at 914 (citation omitted). As to redressability, plaintiffs correctly note that in the context of procedural harms, they need not show that "compelling the agency to follow the correct procedure would lead to a substantive result that favors [their] concrete interests," only that their "concrete interests could be better protected." Narragansett Indian Tribal Historic Pres. Off. v. FERC, 949 F.3d 8, 13 (D.C. Cir. 2020). In this context, a showing by plaintiffs that they would receive an interview is sufficient as that would make it more likely that they would then receive a visa; they need not show that they would necessarily receive a visa.

Plaintiffs raise a number of challenges to State Department policies. First, in their complaint and motion for a temporary restraining order, plaintiffs argue that the policies reflected in the Recalibration Cable and the change to 9 FAM § 502.6-4(d)(2) are arbitrary and capricious.

See Mot. for TRO at 23–24.  Second, in their reply, plaintiffs identify a third change in policy they believe was unlawful, see Consol. Reply in Supp. of Mot. for TRO [Babamuradova ECF No. 18] ("Consol. Reply") at 12–13 (citing State Department Cable 21 STATE 123052 [Babamuradova ECF No. 18-11]), and further allege that the State Department is not following its own policies set forth in 22 C.F.R. § 42.33(e), which states that "[c]onsideration for visa issuance to aliens . . . will be in the regional rank orders."[2]  Consol. Reply at 11–12.  This final argument was a primary focus at the September 22 hearing.  Plaintiffs argue that because the interview scheduling procedure takes more than rank order into account, that procedure violates 22 C.F.R. § 42.33(e).  See id.

The procedural harm that plaintiffs contend establishes standing is their failure to receive the opportunity to apply for a visa (through an interview) before the September 30, 2022 fiscal year ends.  See Mot. for TRO at 11–13.  They must therefore show that the lack of an interview is "fairly traceable" to the challenged policies or that those changes "substantially increased" the risk that plaintiffs will not receive an interview before September 30, 2022.  As to redressability, they need not show that their concrete interest—receiving a diversity visa—will be achieved by a favorable court ruling, only that a favorable court ruling "could still change the substantive outcome," Narragansett Indian Tribal Historic Pres. Off., 949 F.3d at 13, namely, by granting plaintiffs an interview which could lead to a visa.

The Court first addresses the policies challenged in plaintiffs' complaint and motion for a temporary restraining order.  The February 2022 change to 9 FAM § 502.6-4(d)(2) altered the timing of interview scheduling vis-à-vis plaintiffs' rank numbers becoming "current."  Under the previous iteration, interviews could be scheduled when rank numbers were "about to become current"; under the new policy, interviews are scheduled "around the time" the rank numbers are

---

[2] The Court acknowledges that this argument was first made in plaintiffs' reply and the government has not had an opportunity to respond to it in briefing.

"current."   <u>Compare</u> Former FAM Guidelines, 9 FAM § 502.6-4(d)(2), <u>with</u> 9 FAM § 502.6-4(d)(2).

The Recalibration Cable rescinded mandatory prioritization guidance that had been in effect, Recalibration Cable at 1, and "return[ed] the discretionary authority on the provision of consular services, of which visa services are a part, to each post," Consol. Mem. in Opp'n to Mot. for TRO [<u>Babamuradova</u> ECF No. 16] ("Opp'n to TRO") at 14.  The cable provides guidelines for consulate offices to "bear . . . in mind as [they] prioritize [their] work."  Recalibration Cable at 3. That guidance includes, among other things, a note that it "is the Department's policy to use as many of the 55,000 diversity visas available each fiscal year as possible" and a list of other types of visas that consulate offices may want to prioritize, including "immediate relative cases and nonimmigrant K visa applications of fiancés of U.S. citizens," and "[s]easonal priorities such as H-2 applicants, students, U.S. government-funded exchange visitors, and Summer Work and Travel applicants."  <u>Id.</u> at 3–4.

Plaintiffs have not demonstrated how either policy change altered the order of interviews or the number of interviews available.  <u>See</u> <u>Khamrabaeva v. Blinken</u>, No. 22-CV-1219 (RC), 2022 WL 4446387, at *4 (D.D.C. Sept. 24, 2022) ("Plaintiffs fall short of showing a substantial increase in the risk of harm that is traceable to the challenged policies because diversity visa adjudications appear to have accelerated, not decreased, after the challenged policies took effect.").  The change to 9 FAM § 502.6-4(d)(2) shifted all interviews around a bit, at least in terms of how they related to applicants' numbers being "current," but plaintiffs do not explain how that changed the actual ordering in any way.  As to the Recalibration Cable, Plaintiffs argue that this policy "unlawfully prioritized non-immigrant visas over DVs," Mot. for TRO at 8, which (presumably) in turn reduced the number of interviews available for diversity visa applicants.  But plaintiffs have not demonstrated that this policy actually has had any impact on consulates' scheduling or availability

of interviews, and plaintiffs' unfounded speculation is not sufficient.  See Lujan, 504 U.S. at 562 (explaining that when a challenged policy regulates third-party actors, it is the "burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury").  Even assuming that consulate offices heeded its suggested—but nonmandatory—guidance, the policy emphasizes the Department's goal of issuing as many diversity visas as possible.  See Recalibration Cable at 3.  Regardless, plaintiffs have not shown that consulate offices did, in fact, deprioritize diversity visas.  The numbers provided by the government suggest the opposite: the government represented at the September 22 hearing that it is on track to issue over 53,000 diversity visas this year from a maximum of 54,850.

Even if plaintiffs could show that the change to 9 FAM § 502.6-4(d)(2) and the Recalibration Cable had some impact on the processing of diversity visa applications, they cannot show that their applications in particular were affected.  The posts assigned to interview each of the plaintiffs were actively interviewing diversity visa candidates throughout the year.  See Decl. of Brenda Grewe [Babamuradova ECF No. 16-2] ("Babamuradova Grewe Decl. I") at 6; Decl. of Brenda Grewe [Babamuradova ECF No. 16-3] ("Babamuradova Grewe Decl. II") at 6; Decl. of Brenda Grewe [Khamidova ECF No. 11-3] ("Khamidova Grewe Decl. I") at 6 (tables showing the total number of immigrant visas adjudicated at each of the three relevant posts from October 2021 to September 3, 2022).  And each plaintiff is hundreds of spots away from receiving an interview. See Babamuradova Miles Decl. ¶¶ 10, 16 (Babamuradova has 573rd spot in line out of 618 cases eligible for interview but waiting on capacity at the post; Fatikov has 475th spot in line out of 968 cases eligible for interview but waiting on capacity at the post); Khamidova Miles Decl. at ¶ 19 (Khamidova has 264th spot in line out of 607 cases eligible for interview but waiting on capacity at the post).

The numbers provided by plaintiffs underscore the challenge they face in showing that any change in policy has significantly impacted their chance of receiving an interview before September 30.  Plaintiff Babamuradova has 573 applicants ahead of her in line.  Plaintiffs have only identified five applicants whose rank numbers are higher than Babamuradova's who have received or scheduled interviews at the U.S. Embassy at Tashkent, where she is assigned—so even if those five applicants had been put in pure rank order and therefore been later in the queue, none of those five interview slots would have gone to Babamuradova; they would have gone to five of the 573 applicants ahead of her in the queue  at Tashkent.  See Consol. Reply at 3.  The same is true for plaintiffs Fatikov and Khamidova.  For Fatikov, plaintiffs identify 110 applicants with higher rank numbers whose applications have been or will be adjudicated at the U.S. Embassy in Warsaw, id. at 1–2; but Fatikov is number 475 in line.  Similarly for Khamidova, plaintiffs identify 23 applicants with higher rank numbers whose applications have been or will be adjudicated at the U.S. Consulate in Almaty, id. at 2–3; but Khamidova is 264th in line.  Hence, all three plaintiffs are simply too far back in line for a change in the challenged policies to have a substantial impact on their chances of receiving an interview.

The Court will also address the two new arguments raised by plaintiffs in their reply and at the September 22 hearing.  Plaintiffs challenge the policy suggested by 21 STATE 123052, which is a December 2021 cable that notes that KCC will schedule applicants who have submitted their DS-260 and supporting documentation before they schedule applications who, pursuant to the change of policy that took place at that time, submitted just their DS-260.  See State Department Cable 21 STATE 123052 at 2.  This policy appears to just restate what the government has elsewhere noted—both rank order number and the date that documents were submitted are taken into account.  Moreover, plaintiffs' arguments suffer from the same problem as the arguments over the Recalibration Policy and the change to 9 FAM § 502.6-4(d)(2): the numbers simply don't add

up.  Plaintiffs have not demonstrated, as they must, that absent this policy they would have received an interview or had a substantially increased likelihood of receiving an interview before September 30.

Plaintiff's final policy challenge is to, more generally, the process the State Department uses to schedule applications.  As described above, the scheduling of diversity visa interviews is based on a number of factors, including rank order, the date at which an application was submitted and processed, and consulate capacity.  See Khamidova Miles Decl. ¶ 10 ("To schedule cases, KCC creates a calendar for each post in DVIS, which DVIS fills by ordering and selecting cases from the AV queue for that post based on the date that cases transition to AV status and regional rank order . . . ." (emphasis added)).  Plaintiffs argue that this system—which takes factors beyond strict regional rank order into account—violates 22 C.F.R. § 42.33(e), which states that "Consideration for visa issuance to aliens . . . will be in the regional rank orders."  The government counters that its system follows this regulation, but that the State Department's "consideration" only happens after the Visa Office allocates the case a visa number, which requires the applicant's documents to be complete and processed.  See Opp'n to TRO at 29 ("Prior to the allocation of a visa number, the selectee is not eligible to apply formally for a visa.  The Department, therefore, limits 'consideration for visa issuance' to only those cases that are eligible to apply." (citations omitted)).  Thus, the government argues, § 42.33(e) permits other factors to be considered alongside rank order in the broader application and scheduling process.

At the hearing, plaintiffs conceded as much, as they agreed that some prudential considerations—delays in submission of forms or consulate capacity—can be taken into account in interview scheduling.  Plaintiffs ultimately settled on arguing that § 42.33(e) requires that

interviews "must be administered within rank order once the application has been submitted." Rough Tr. of Hearing at 52:12–15.[3]

Hence, plaintiffs' argument on § 42.33(e) runs into the same problem of standing as the other three challenged policies.  If plaintiffs truly argued that interviews must be scheduled in pure rank order, regardless of document submission or processing, then the standing inquiry would be whether a pure rank order interview schedule would have afforded plaintiffs interviews at their respective posts.[4]  Even that has not been established at this stage.  Plaintiffs note that the government has not provided them with information as to exactly how many interviews were scheduled at each post with a rank order number higher than plaintiffs' number.  That may be.  But plaintiffs carry the burden of showing each preliminary relief requirement by "a clear showing," Gorgadze, 2021 WL 4462659, at *5 (citation omitted), and the burden is on a plaintiff to establish standing, id. at *4.  Plaintiffs simply have not shown that, given how far down they are on the interview lists, even the extreme policy—scheduling based only on rank order—would have afforded them an interview.  But this is not what they argue.  Plaintiffs argue, in essence, that there should be a slightly different version of scheduling that perhaps does not use the (admittedly opaque) visa number assignment system or AV queue—that as soon as an applicant's forms are in, they should be scheduled before any higher-ranked applications whose forms were submitted at the same time or after.

---

[3] This document is on file with the Court.  The pagination of the rough version of this transcript may be different from that in any later-filed official version.

[4] Plaintiffs use the term "skipped over" frequently and argued at the hearing that they were "singled out." Those terms imply that plaintiffs were the only applicants with rank order numbers lower than those that have been scheduled so far.  However, the evidence submitted thus far does not suggest that.  At each post, there are a limited number of applications with higher rank order numbers than plaintiffs that have been scheduled, see generally Consol. Reply Exs. B, C, D [Babamuradova ECF Nos. 18-2, -3, -4] (showing tables that plaintiffs describe as tables of rank order numbers and their respective statuses, sourced from www.savediversityvisa.org, for each post at issue in this case), and plaintiffs are one of many lower-ranked applicants who could argue that they were "skipped over" by those few applications.

The government's system takes both rank order and document submission and processing date into account.  Plaintiffs want to shore up that system—they believe that § 42.33(e) commands a more rigid use of rank order number than the government has so far described to this Court, see, e.g., Khamidova Miles Decl. ¶ 10 (noting that interview scheduling is, in a general sense, "based on the date that cases transition to AV status and regional rank order").  Given the little daylight that the Court can glean between plaintiffs' proposed system and what the government already uses, plaintiffs face a steep uphill battle in proving that using the system they identify as lawful under § 42.33(e) would have afforded plaintiffs an interview at their respective consulates.  Not only do plaintiffs not identify how many higher-ranked applications have been interviewed before plaintiffs', but they do not offer any evidence as to whether those applications, under their proposed scheduling system, would have nonetheless rightfully been scheduled before plaintiffs were.  Hence, under either a theory that § 42.33(e) requires an extreme rank-order system or that it requires the system plaintiffs argued for during the hearing, plaintiffs have not shown that such a scheduling system would have produced a more favorable outcome for plaintiffs than the scheduling system the government has in fact been using all year.

As to redressability, plaintiffs also have not shown that they would be afforded an interview—which is necessary to obtain a visa—even if a court fashioned some relief ordering the government to schedule interviews in plaintiff's preferred way.  Even under the relaxed standards for procedural injuries, "a wholly speculative prospect of redress still does not pass muster." Narragansett Indian Tribal Historic Pres. Off., 949 F.3d at 13.  Taking into account the interviews that the State Department has scheduled for the rest of September, there will be a very small number of visas left before it reaches the statutory cap.  Given how far back in line plaintiffs are at their respective posts, any sort of relief that simply required the government to make adjustments

to their interview scheduling, even if the Court had some power to waive the September 30 deadline, could not and would not better protect their interests.

In sum, because plaintiffs have not shown that they have suffered an injury traceable to any of the challenged policies and that would be redressed by a favorable court decision, they lack standing to bring these claims and consequently have not shown a substantial likelihood of success on them.

## II.   The Department is Not Unlawfully Withholding Interviews in Violation of a Non-Discretionary Duty.

Plaintiffs contend that the State Department has a non-discretionary duty to complete each step of the diversity visa adjudication process.  See Mot. for TRO at 15–18.  They rely generally on 8 U.S.C. § 1202(b), which is titled: "Other documentary evidence for immigrant visa."  Section 1202(b) describes what documentation a visa applicant must provide and to whom they must submit the documentation.  The section concludes: "All immigrant visa applications shall be reviewed and adjudicated by a consular officer."  Plaintiffs also rely on the FAM, which contains language describing when the KCC will schedule interviews.  See Mot. for TRO at 16 (noting the "KCC 'will schedule an appointment for applicants that have completed processing at KCC around the time their regional program rank number is current'" (quoting 9 FAM § 502.6-4(d)(2))).

As an initial matter, plaintiffs suggested during the hearing that they no longer argue that § 1202(b) imposes a non-discretionary mandatory duty to adjudicate all visa applications.  Rough Hr'g Tr. at 29:16–24.  Nonetheless, the Court will address the point.

The APA authorizes courts to compel agency action that has been "unlawfully withheld." 5 U.S.C. § 706(1).  This provision allows courts to provide relief for a failure to act.  However, courts may compel action based only on certain failures to act.  "It is well established that 'a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take.'"  Ctr. for Biological Diversity v. Zinke, 260 F. Supp. 3d

11, 20 (D.D.C. 2017) (quoting <u>Norton v. S. Utah Wilderness All.</u>, 542 U.S. 55, 64 (2004)). "The limitation to <u>required</u> agency action rules out judicial direction of even discrete agency action that is not demanded by law . . . ." <u>Norton</u>, 542 U.S. at 65.

Neither 8 U.S.C. § 1202(b) nor the FAM calls for a "discrete action" that the State Department was "required to take" vis-à-vis the plaintiffs. As plaintiffs note, some courts have found that 8 U.S.C. § 1202(b) imposes a mandatory duty on consular officers to "review[] and adjudicate[]" all immigrant visa applications. <u>See, e.g.</u>, <u>Rai v. Biden</u>, 567 F. Supp. 3d 180, 195 (D.D.C. 2021) (citation omitted). But plaintiffs' position, with respect to each individual visa applicant, is ultimately untenable. As an initial matter, § 1202(b) is not limited to diversity visa applications—it provides guidelines for <u>all</u> immigrant visa applicants. To hold that this provision requires every visa application, across all visa-related statutory schemes, to be adjudicated would be a far-reaching conclusion—as one judge put it, such a conclusion "would truly be the proverbial elephant in a mousehole." <u>Zarei v. Blinken</u>, Civ. A. No. 21-02102 (CJN), 2021 WL 9146060, at *1 (D.D.C. Sept. 30, 2021) (citing <u>Whitman v. Am. Trucking Ass'ns, Inc.</u>, 531 U.S. 457, 468 (2001)).

Nor is plaintiffs' interpretation the best reading of the statute. Section 1202(b) describes the documentation that visa applicants must provide, to whom they must provide it, and concludes by noting: "All immigrant visa applications shall be reviewed and adjudicated by a consular officer." 8 U.S.C. § 1202(b). Read in context, this sentence cabins the State Department's discretion as to <u>who</u> may review and adjudicate immigrant visa applications; it does not mandate that all applications actually be adjudicated. Nor, in practice, can it: "the Department routinely selects far more diversity visa entrants than there are available visas," Opp'n to TRO at 21, meaning that thousands of selectees who apply by submitting a DS-260 will not be interviewed and their applications will never be adjudicated.

This is not to say that the State Department could necessarily decline to process all diversity visa applications in a given year. That extreme concern is what animated courts in cases like <u>Rai</u>, 567 F. Supp. 3d at 195, <u>Filazapovich v. Dep't of State</u>, 560 F. Supp. 3d 203, 225 (D.D.C. 2021), and <u>Gomez v. Biden</u>, No. 20-cv-01419 (APM), 2021 WL 3663535, at *20 (D.D.C. Aug. 17, 2021).[5] Those courts opined on the issue in regard to fiscal year 2021, during which the State Department declined to schedule interviews for diversity visa selectees for four months based on an interpretation of a proclamation from then-President Trump. <u>See</u> <u>Nishihata v. Blinken</u>, Civ. A. No. 21-2173 (CKK), 2021 WL 4476750, at *7 (D.D.C. Sept. 30, 2021) ("The court in <u>Filazapovich</u> held that 8 U.S.C. § 1202(b) 'imposes a nondiscretionary duty on Defendants to adjudicate diversity visas[.]' But the plaintiffs in <u>Filazapovich</u> challenged not only Defendants' failure to adjudicate their individual visa petitions, but also the Executive policies writ large that halted all diversity visa processing at the beginning of [fiscal year] 2021." (alteration in original)). Such extreme circumstances are not present here.

And it is clear that reading § 1202(b) to require consular offices to adjudicate <u>all</u> fiscal year 2022 visa applications would still be extreme. Interviews are scheduled based on, among other things, the capacity of the consular offices and embassies. <u>See</u> <u>Babamuradova</u> Grewe Decl. III ¶ 2 ("When a post provides or updates its capacity and schedule for DV interviews to KCC, KCC inputs the capacity and schedule by post into DVIS, which then fills those appointments with cases . . . ."). If a post does not have capacity to interview someone—thereby reviewing and adjudicating their visa application—it cannot do so.

---

[5] Judge Mehta, who decided <u>Filazapovich</u> and <u>Gomez</u>, held a hearing in a similar motion for other fiscal year 2022 diversity visa selectees. As the government describes, Judge Mehta denied that motion in the hearing, noting that the decisions in <u>Filazapovich</u> and <u>Gomez</u> "were limited to the specific facts of those cases, in which the State Department had ceased processing diversity visas altogether, and did not apply to the facts of this year." Notice of Suppl. Authority (describing the hearing in <u>Obiedat v. Blinken</u>, Civ. A. No. 22-2326 (APM) (D.D.C.)).

Even if the Court were to read § 1202(b) as a command to review and adjudicate all visa applications, it still would not conclude that the plaintiffs have a likelihood of success on the merits of their unlawful withholding claim.[6]  Section 1202(b) contains no direction as to the timing of such review.  Plaintiffs suggest that the guidelines in the FAM supply timing and deadlines for adjudication.  However, those guidelines do not carry the force of law.  See Christensen v. Harris County, 529 U.S. 576, 587 (2000) (noting that "interpretations contained in policy statements, agency manuals, and enforcement guidelines . . . lack the force of law"); United Afr. Org. v. Biden, No. 1:22-CV-02599, 2022 WL 3212370, at *11 (N.D. Ill. Aug. 9, 2022) (concluding that the FAM neither "determines the rights, obligations, or legal consequences of any person regulated by the State Department,"  nor "interpret[s] any other conduct-governing statute or regulation that would in turn result in a consular official imposing some rule of conduct on a regulated person," and it therefore lacks the force of law).  Accordingly, the FAM does not require the State Department to take any action at all, let alone an action in a given time frame.  See Norton, 542 U.S. at 65; cf. Elec. Priv. Info. Ctr. v. Internal Revenue Serv., 910 F.3d 1232, 1244–45 (D.C. Cir. 2018) (noting that a "non-binding document cannot impose on an agency an enforceable duty to act").

As a result, even reading § 1202(b) to mandate some form of adjudication of all 2022 diversity visa selectees' applications would not provide plaintiffs with the relief they seek.  First, such a finding would, in theory, apply to all diversity visa applicants.  As discussed above, there are hundreds of applicants ahead of all three plaintiffs in line—in all likelihood, the government would hit the statutory cap long before plaintiffs were interviewed.  Second, plaintiffs have not shown that September 30 is the date at which the withholding of all applicants' interviews becomes

_____

[6] It appears, of course, that the State Department will come very close to reaching the 54,850 visa limit of 2022 diversity visas; hence, "[w]hether a suspension, or even a significant slowdown, of diversity visa adjudications would constitute a violation of a nondiscretionary duty established under § 1202(b) or under the broader visa processing framework established by the INA and its implementing regulations is not a question before the Court in this case." Khamrabaeva, 2022 WL 4446387, at *6.

unlawful.  Cf. Gomez v. Trump, 485 F. Supp. 3d 145, 196 (D.D.C. 2020) ("Defendants correctly note that that provision does not expressly require the State Department to conclude processing diversity visas by" the end of the fiscal year.).  Indeed, it may be that all applications eventually do receive a decision, but because the State Department has either reached its statutory cap or the September 30 deadline has passed, the remaining applications are rejected—that is the "adjudication" of those applications.  Either way, plaintiffs have not shown that this Court should order the State Department, at this time, to take action pursuant to § 1202(b) on their visa applications under an unlawful withholding theory.

**III.    The Department Has Not Unreasonably Delayed Interviews**

Plaintiffs also assert that the State Department has unlawfully delayed a decision on their visa applications.  See Mot. for TRO at 18–22.  The conclusion just reached—that the State Department has no non-discretionary duty to adjudicate plaintiffs' applications—also forecloses this claim.  See Norton, 542 U.S. at 63–64 & n.1 (noting that "a delay cannot be unreasonable with respect to action that is not required").  However, even if there were a duty to adjudicate applications (as the D.C. Circuit theoretically could find in a case pending before it now), the factors set out in Telecomms. Research & Action Ctr. v. FCC ("TRAC"), 750 F.2d 70 (D.C. Cir. 1984), for assessing the merits of an unlawful-delay claim would not support finding a likelihood of success here.  Those factors are:

> (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

TRAC, 750 F.2d at 79–80 (cleaned up) (citations omitted).

The first factor asks whether the delay is reasonable.  "That issue cannot be decided in the abstract, by reference to some number of months or years beyond which agency inaction is presumed to be unlawful, but will depend in large part . . . upon the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency." Mashpee Wampanoag Tribal Council, Inc. v. Norton, 336 F.3d 1094, 1102 (D.C. Cir. 2003). Plaintiffs do not engage with these factors, and instead argue only that guidance sent out in December 2021 provides a "rule of reason" as it imposes a "duty to schedule interviews."  Mot. for TRO at 19.  That guidance states that "[o]nce the DS-260 is received for all applicants associated with a case, that case will be eligible to be scheduled for a visa interview."  Dec. 9, 2021 Guidance at 1.  That guidance, then, impacts when during the process an applicant must provide documentation, not the scheduling of interviews.  It changes what an applicant needs in order to be eligible to schedule an interview, but eligibility does not entitle applicants to an interview—the availability of interviews is dependent on, among other things, "consulate conditions and capabilities."  Gjoci, 2021 WL 3912143, at *15.  The data provided by the government suggests that the consulates assigned to each plaintiff here are acting reasonably in scheduling diversity visa interviews in light of competing demands on their time and resources. See Babamuradova Grewe Decl. I at 6 (showing hundreds of visas adjudicated each month at the U.S. Embassy in Warsaw); Babamuradova Grewe Decl. II at 6 (same for U.S. Embassy at Tashkent); Khamidova Grewe Decl. I at 6 (showing similar numbers for U.S. Consulate in Almaty).

In the context of the diversity visa program, courts are divided as to the second TRAC factor—whether Congress "provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute."  Compare Shahi, 33 F.4th at 929 (holding that the statutory framework for diversity visas "does not set a time limit for administrative

action"), with Pushkar v. Blinken, Civ. A. No. 21-2297 (CKK), 2021 WL 4318116, at *8 (D.D.C. Sept. 23, 2021) ("[T]he September 30 deadline to issue diversity visas indicates the 'speed' at which Congress intended these visas to be processed . . . ."). The Court agrees with the reasoning in Pushkar that the statutory framework provides an "indication of the speed" at which the State Department must administer the diversity visa program generally. But that does not mean it is the speed at which each individual application must be adjudicated. As described above, posts simply do not have the capacity to interview every applicant, nor are there enough visas for every selectee in a given fiscal year. The government is processing diversity visas on the whole at a sufficient speed and is on track to issue just under 55,000 diversity visas. See Rough Hr'g Tr. at 2:24–3:1, 3:11–13, 5:15–17 (estimating that the State Department "is on pace to issue at least 53,000 diversity visas"). Hence, the second factor does not provide support for plaintiffs.

Skipping ahead, the fourth factor instructs courts to consider "the effect of expediting delayed action on agency activities of a higher or competing priority," TRAC, 750 F.2d at 80, and a finding that the fourth factor favors the government can, by itself, be sufficient to deny a TRO, see Mashpee Wampanoag Tribal Council, Inc., 336 F.3d at 1100–01; In re Barr Labs., Inc., 930 F.2d 72, 75 (D.C. Cir. 1991) (rejecting unlawful-delay claim where all but the fourth factor weighed in plaintiffs' favor because "a judicial order putting [plaintiff] at the head of the queue [would] simply move[] all others back one space and produce[] no net gain"). The availability of interviews is dependent on consular resources and capacity. The consular offices are adjudicating not only diversity visa applications, but also other immigrant and nonimmigrant visas. Granting plaintiffs' TRO and requiring the State Department to schedule their interviews would simply push some other applicants "further back in line when the only difference between them is that plaintiff[s have] brought a federal lawsuit." Verma v. U.S. Citizenship & Immigr. Servs., Civ. A. No. 20-3419 (RDM), 2020 WL 7495286, at *9 (D.D.C. Dec. 18, 2020) (citation omitted); accord

Khamrabaeva, 2022 WL 4446387, at *7 (noting that a TRO based on similar claims by diversity visa selectees would be "a judicial order moving them up, and therefore others back, with no net gain").

Plaintiffs argue that because they were entitled to have their interview scheduled earlier, granting the TRO would simply restore their place in line.  But the facts suggest otherwise.  As described earlier, for each plaintiff there are hundreds of applicants, assigned to the same post, who have an earlier AV progress stage date than plaintiffs, meaning that they are rightfully ahead of plaintiffs in line.  It may be that some of these applicants in front of plaintiffs have higher rank numbers.  But as discussed earlier, rank number is just one input—for example, plaintiffs have offered no evidence that there are applicants with higher rank order numbers who had their documents submitted later than plaintiffs and are earlier on the consulate-specific queue.  And in any event, ordering consulates to interview plaintiffs would catapult them ahead of every one of the hundreds of applicants waiting for an interview, not just those who have allegedly been scheduled out of line.  Hence, the Court concludes that granting the TRO would simply allow plaintiffs to skip the line, and the fourth factor strongly suggests finding an unreasonable delay is inappropriate.

With that in mind, the third and fifth factors are neutral for plaintiffs.  The third factor notes that there may be a difference in the reasonableness of a delay if it is a matter affecting "human health and welfare" versus "in the sphere of economic regulation."  TRAC, 750 F.2d at 80.  The fifth factor similarly considers the "interests prejudiced by the delay."  Id.  To be sure, plaintiffs' interests are great, and they certainly are interests affecting human health and welfare.  But a TRO requiring the posts to adjudicate these plaintiffs' applications will negatively impact some other applicants, as their applications would then be the ones that do not get adjudicated.  The third and fifth factors therefore favor neither the plaintiffs nor the government.

Finally, the sixth factor does not impact the conclusion either way. Plaintiffs have suggested that the State Department has acted inappropriately in its scheduling. But the Department denies this, and the plaintiffs have not offered any evidence to refute the Department's representations that it is scheduling interviews in the same way that it has for years. See Babamuradova Grewe Decl. III ¶ 3. The Court therefore does not make any finding of impropriety on the State Department's part.

In sum, none of the other five factors provide the plaintiffs with strong enough support to overcome the fourth factor: the effect on other visa applicants that an order directing the State Department to adjudicate plaintiffs' cases first would have. Hence, the TRAC factors do not support a finding of unreasonable delay by the State Department.

## IV.    Plaintiffs Are Not Likely to Succeed on Their Mandamus Claims

"Mandamus is a 'drastic' remedy, 'to be invoked only in extraordinary circumstances.'" Fornaro v. James, 416 F.3d 63, 69 (D.C. Cir. 2005) (quoting Allied Chem. Corp. v. Daiflon, Inc., 449 U.S. 33, 34 (1980)). "Mandamus is available only if: (1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff." Id. (citation omitted). What plaintiffs must show to establish a mandamus claim is similar to what they must show to succeed on their unreasonable delay and unlawful withholding claims under the APA, as in both instances plaintiffs must establish that the government has a clear, nondiscretionary duty. See Norton, 542 U.S. at 63 (Section 706(1) "carried forward the traditional practice prior to its passage" of issuing writs of mandamus). Hence, for the same reasons that there is no likelihood of success on the APA claims, plaintiffs are unlikely to succeed on their mandamus claims as well.

## **Conclusion**

Because plaintiffs have not established a likelihood of success on any of their claims, the Court "need not proceed to review the other three [preliminary relief] factors," Ark. Dairy Co-op Ass'n, Inc. v. U.S. Dep't of Agr., 573 F.3d 815, 832 (D.C. Cir. 2009), and hence will deny plaintiffs' motions for TROs.

/s/
_____
JOHN D. BATES
United States District Judge

Dated:  September 27, 2022